**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

GLENN A. CULPEPPER,

        Plaintiff,

  -against-

SUMMIT MATERIALS HOLDINGS L.P.,

        Defendant.

Civil Action No.

**COMPLAINT**

---

Plaintiff, Glenn A. Culpepper ("Culpepper" or "Plaintiff"), by his attorneys, Cole Schotz P.C., for his Complaint against Defendant Summit Materials Holdings L.P. ("Summit" or "Defendant"), alleges as follows:

## INTRODUCTION

1. This is a civil action for breach of contract, unjust enrichment, intentional and/or negligent misrepresentation, and declaratory judgment arising from Defendant's improper and unlawful efforts to divest Culpepper of certain equity interests in the company believed to be valued in excess of $2 million dollars.

2. As explained below, the shares were issued to Culpepper as incentive to leave his long-standing, high-level position with his previous employer and join Summit, a competing building materials manufacturing and supply company.  Once at Summit, Culpepper played an instrumental role in the growth and success of the company including, for example, in connection with eighteen corporate acquisitions and a $250 million public offering of debt securities.  Culpepper also secured Summit's largest debt investor, Oak Tree Capital, which purchased approximately $75 million of the company's bonds, an investment made possible through Culpepper's long-standing relationship with Oak Tree Capital and its principals.

3. Despite Summit's tremendous success during Culpepper's tenure, Culpepper amicably left Summit effective December 31, 2012. Rather than standing by its financial commitments, Summit devised a plan to strip Culpepper of his equity interests through any means possible. First, Summit notified Culpepper that his Class D shares, which had been valued by the company (both privately and in public filings) at millions of dollars, were essentially worthless. Summit went on to demand that Culpepper execute an acknowledgment of cancellation of his purportedly worthless shares. Given his own knowledge of the actual value of the shares, Culpepper rejected Summit's sudden devaluation and requested a full accounting and explanation of same. Culpepper never received an explanation. Culpepper later learned that Summit has engaged in this same scheme with other former employees who did not question the devaluation and were ultimately divested of thousands, if not millions, of dollars in equity.

4. In light of Culpepper's inquiry regarding the sudden and inexplicable devaluation of his shares, Summit went silent. Months later, Summit finally reached back out to Culpepper, not to explain the unexpected devaluation and cancellation of his shares, but to notify him that he had forfeited those shares by purportedly violating the non-solicitation provision of the governing subscription agreement. According to Summit, the violation occurred in May 2013, months before Summit attempted to devalue and cancel Culpepper's shares, and over a year before Culpepper was ever notified of any purported violation. As explained further below, Summit's feigned allegations have no basis in reality and are instead a blatant second attempt to improperly and unlawfully divest Culpepper of his equity interests in the company.

## THE PARTIES

5. Culpepper is an individual residing at 6835 East Camelback Road, Scottsdale, Arizona.

55201/0001-13329216v1

6. Upon information and belief, Summit is a Cayman Islands exempted limited partnership with its principal place of business located at 1550 Wynkoop Street, Third Floor, Denver, Colorado. Upon further information and belief, Summit operates as a subsidiary of Summit Materials, Inc.

## JURISDICTION AND VENUE

7. The Court has diversity jurisdiction of this controversy pursuant to 28 U.S.C. § 1332(a)(2). Plaintiff is a citizen of Arizona. Defendant is a foreign corporation and a citizen of a foreign country (Cayman Islands). The amount in controversy exceeds $75,000.

8. Venue is proper in this District pursuant to the terms of the controlling agreement between the parties, which provides, in pertinent part, that "[t]he parties hereto hereby irrevocably submit to the exclusive jurisdiction of … the federal courts of the United States of America located in New York …."

## FACTUAL ALLEGATIONS

*Background Facts*

9. In 2010, Culpepper was approached by Thomas W. Hill, Summit's Chief Executive Officer ("CEO"), about joining Summit. At the time, Culpepper was employed by CRH plc ("CRH"), a worldwide building materials manufacturing and supply company.

10. Culpepper began working at CRH in 1989. CRH does business in the United States as Oldcastle, Inc. ("Oldcastle"). In 1996, Culpepper was named Chief Financial Officer ("CFO") of Oldcastle Materials, Inc. ("Oldcastle Materials"), the materials division of Oldcastle, a position he held until August 2008. During his time as CFO, the annual revenue of Oldcastle Materials grew from approximately $365 million to $7.5 billion. In August 2008, Culpepper was

named CFO of CRH worldwide.  During his time as CFO, CRH operated in thirty-five countries and had annual revenue in excess of $20 billion.

11. Upon information and belief, Hill began working at CRH in 1980.  While with CRH, Hill held a variety of executive positions including CEO of Oldcastle Materials and, later, CEO of Oldcastle.  Hill left CRH in 2008 and co-founded Summit in 2009.

12. In 2010, Hill approached Culpepper about joining him at Summit.  Summit's initial offer included a salary (less than half of Culpepper's salary at CRH) along with twelve percent of the carried interest (the "Class D Shares") of Summit.  According to Hill, at the time of the offer, the Class D Shares offered to Culpepper were already valued at "a few million" dollars, while at least one formal valuation presented to Culpepper valued those shares at $2.8 to $11.6 million, with an exit value of $9.6 to $34.4 million.  Despite that valuation, Culpepper was reluctant to leave his high-level leadership position at CRH and rejected Summit's offer.

13. As additional incentive to convince Culpepper to leave CRH and join Summit, Summit increased the percentage of Class D Shares from twelve percent to fourteen percent.  Relying on statements made by Hill, as well as several valuation models presented by Summit, Culpepper ultimately accepted Summit's offer, left his long-standing position at CRH, and joined Summit effective July 1, 2010.

*The Management Interest Subscription Agreement*

14. In August 2010, Summit and Culpepper entered into a Management Interest Subscription Agreement (the "Subscription Agreement") governing the issuance of the Class D Shares to Culpepper.  According to the Subscription Agreement, the Class D Shares would vest twenty percent on the first anniversary of closing and an additional 1.667% monthly thereafter, with the Class D Shares becoming fully vested on the fifth anniversary of closing.

15. In exchange for the benefits under the Subscription Agreement, Culpepper agreed to certain restrictive covenants, including not soliciting any Summit employees to leave Summit for a period of twelve months following termination of Culpepper's employment. Pursuant to the Subscription Agreement, a violation of the restrictive covenants would result in forfeiture of any vested or unvested interests, including the Class D Shares.

*Culpepper's Tenure With Summit*

16. During his time as executive, Summit completed eighteen corporate acquisitions and filed a public securities debt offering in the amount of $250 million. Culpepper was instrumental in the public offering including, most significantly, securing Summit's largest debt investor, Oak Tree Capital, which purchased approximately $75 million of the debt securities. The Oak Tree Capital investment was made possible through Culpepper's long-standing relationship with Oak Tree Capital and its principals.

17. Despite the tremendous growth and success of Summit during Culpepper's tenure, in December 2012, Culpepper decided to leave Summit and accept the position of CFO and Executive Vice President of Republic Services, Inc. ("Republic"). Culpepper provided notice of his departure on December 19, 2012, with an effective termination date of December 31, 2012.

18. Following his departure, Culpepper continued to assist Summit whenever called upon. For example, in the Summer of 2013, Summit was considering expansion into the recycling industry and contacted Culpepper for advice concerning, among other things, the economics of building a municipal recycling facility. Culpepper later assisted one of Summit's founders, Ted Gardner, in finding employment for his executive assistant.

55201/0001-13329216v1

*Summit's Efforts To Devalue and Cancel Culpepper's Class D Shares*

19.     Based on the vesting schedule set forth in the Subscription Agreement, Culpepper's Class D Shares were fifty percent (50%) vested at the time he left Summit.

20.     On or about May 24, 2013, Summit filed a Form S-4 with the United States Securities and Exchange Commission ("SEC") that included a schedule setting forth the aggregated market value of the Class D Shares as of December 29, 2012. According to that schedule, the vested Class D Shares at the time of Culpepper's departure had an average fair market value of $3271.12 per share, for an aggregate value in excess of $2 million.

21.     Culpepper heard nothing from Summit regarding his Class D shares until December 3, 2013, when he received a letter from Hill (dated November 22, 2013), on behalf of Summit, advising that Summit had determined the aggregate fair market value of his Class D Shares to be **$0.00**, and requesting that Culpepper execute a form cancellation acknowledgment with respect to those shares. Hill provided no further explanation for how the Class D Shares – which had previously been valued at millions of dollars – were now essentially worthless.

22.     Hill's letter came as a surprise to Culpepper, particularly in light of, among other things: (i) the statements concerning the value of the Class D Shares made by Hill to Culpepper when negotiating his compensation arrangement with Summit; (ii) the valuations presented to Culpepper when negotiating his compensation arrangement with Summit; (iii) Summit's SEC filings reflecting the value of the Class D Shares at the time of Culpepper's departure; and (iv) Culpepper's own knowledge of the value of the Class D Shares obtained by Culpepper while still employed by Summit. Based on the foregoing, Culpepper assumed the November 22, 2013, letter and cancellation acknowledgment was simply a veiled attempt by Summit to reclaim his Class D Shares so those shares could be reissued to someone else within the company.

23. Culpepper responded to Hill's November 22, 2013 letter, requesting an explanation and questioning the need to cancel his Class D Shares if those shares were indeed worthless. Given the purported valuation, Culpepper also decided to hold onto his Class D Shares with the hope that Summit would eventually be sold and/or go public.

24. Culpepper later learned that he was not the only Summit employee whose interests were suddenly devalued without explanation upon departure from the company. Culpepper is aware of at least four instances where Summit has unexpectedly and inexplicably devalued the interests of Summit employees to zero or nominal amounts upon termination.

*Summit Claims A Non-Solicitation Violation and Forfeiture of Culpepper's Class D Shares*

25. Summit never provided Culpepper with any explanation of its sudden devaluation of his Class D Shares. Instead, Summit decided to change the conversation by fabricating a restrictive covenant violation that would, if true, result in Culpepper forfeiting those shares.

26. Specifically, on July 8, 2014 – nearly **eight** months after Culpepper refused to acknowledge the cancellation of his devalued Class D Shares – Culpepper received a letter from Anne L. Benedict, Summit's Chief Legal Officer, claiming, **for the first time**, that Culpepper breached the non-solicitation provision of the Subscription Agreement by purportedly "hiring" Richard Kang, a former Summit employee, to work with him at Republic.[1] According to Benedict, Culpepper's purported breach resulted in the immediate forfeiture of his Class D Shares (which Summit previously claimed had zero value). The letter also improperly states that Culpepper's employment with Summit terminated on December 14, 2012, rather than December 31, 2012.

---

[1] The July 8, 2014, letter references and attaches a February 20, 2014, letter from Benedict to Culpepper that Culpepper had not received. Culpepper requested proof of delivery from Benedict, although same was never provided to him.

27.     On July 29, 2014, Culpepper responded, requesting support for Summit's claims that he had forfeited his Class D Shares, clarifying that his termination was effective December 31, 2012, and reminding Summit that all calculations made with respect to the vesting of his Class D Shares should be based on that date.

28.     The purported breach arising from Kang's departure in May 2013 was never once mentioned to Culpepper in the many conversations Culpepper had with Summit executives, including Hill, following Kang's departure including, without limitation, when Summit called upon Culpepper to provide valuable advice concerning Summit's planned expansion into the recycling business. In fact, Summit did not notify Culpepper of this purported violation until July 8, 2014, **well over a year after the violation purportedly occurred**.

29.     Culpepper does not dispute that Kang, a relatively low-level Summit employee, left Summit for a job opportunity at Republic. Upon information and belief, Kang began seeking new employment in or around Fall 2012 – while Culpepper was still employed at Summit – following efforts by Summit to relocate Kang and his family to Summit's new corporate headquarters in Colorado.

30.     Culpepper had absolutely no role in Kang's decision to leave Summit, nor was he involved in any way in the application, interview, or hiring process. Instead, upon information and belief, the entire interview and hiring process was conducted by Kang's supervisor, Julia Arambula, who ultimately hired Kang. When Culpepper learned that Kang may be seeking a position at Republic, Culpepper specifically avoided any involvement in the process and was not even advised when Kang was hired.

31.     Based on the foregoing, it is clear that Summit's eleventh-hour and unsupported allegations concerning Culpepper's purported breach of the non-solicitation covenant of the

Subscription Agreement is merely a feigned attempt to divest Culpepper of over $2 million in equity following his refusal to accept the sudden, inexplicable and contrived devaluation of his Class D Shares and succumb to Summit's effort to cancel those shares.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

32. Culpepper repeats and realleges each and every allegation contained in the preceding paragraphs as if same were fully set forth herein.

33. As set forth above, Culpepper and Summit entered into a valid and enforceable agreement whereby Culpepper was granted Class D Shares in exchange for valuable services provided by Culpepper to Summit.

34. Culpepper satisfied all requirements under his agreement with Summit to maintain his Class D Shares.

35. Summit breached its obligation to Culpepper by cancelling and/or attempting to cancel Culpepper's Class D Shares without justification.

36. As a direct and proximate result of Summit's breach, Culpepper has suffered and continues to suffer substantial damages.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

37. Culpepper repeats and realleges each and every allegation contained in the preceding paragraphs as if same were fully set forth herein.

38. Summit has been unjustly enriched at the expense of Culpepper. Culpepper conferred substantial benefits upon Defendants throughout the course of his employment with Summit. Summit appreciated, accepted and retained those benefits and an inequity would result if Summit were permitted to retain those benefits without compensation to Culpepper.

55201/0001-13329216v1

## THIRD CAUSE OF ACTION
### (Intentional and/or Negligent Misrepresentation)

39. Culpepper repeats and realleges each and every allegation contained in the preceding paragraphs as if same were fully set forth herein.

40. Summit, through Hill and others, represented to Culpepper that the value of the Class D Shares issued to Culpepper were valued at several million dollars.

41. Relying on the aforementioned statements by Hill and others, Culpepper agreed to leave his high-level position at his former employer, join Summit for a significantly reduced salary, and provided substantial and valuable services to Summit throughout his employment.

42. Culpepper justifiably relied on Summit's representations to his own detriment.

43. As a direct and proximate result of Summit's conduct as aforesaid, Culpepper has suffered and continues to suffer substantial damages.

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment)

44. Culpepper repeats and realleges each and every allegation contained in the preceding paragraphs as if same were fully set forth herein.

45. The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, provides this Court, in the case of actual controversy, with the authority to declare the rights and other legal relations of any interested party seeking such declaration.

46. An actual controversy exists between Summit and Culpepper regarding the validity and valuation of his Class D Shares and a declaration is necessary and appropriate to protect and enforce Culpepper's rights.

**WHEREFORE**, Culpepper hereby demands judgment against Summit on all claims asserted, as follows:

      (a)    A declaration that Culpepper's shares have not been cancelled, that Culpepper has fully performed under the parties' agreement, that Culpepper has not breached the parties' agreement, and that Culpepper is therefore entitled to the Class D Shares or, alternatively, the fair market value of those shares;

      (b)    An accounting of the current fair market value of Culpepper's Class D Shares;

      (c)    Compensatory damages, consequential damages, and punitive damages;

      (d)    Attorneys' fees and costs; and

      (e)    All other and further relief to which Culpepper may be justly entitled.

DATED: New York, New York  
July 22, 2016

COLE SCHOTZ P.C.

By:   */s/ Leo V. Leyva*  
     Leo V. Leyva  
     David S. Gold  
     1325 Avenue of the Americas, 19th Floor  
     New York, New York 10019  
     (212) 752-8000  
     Fax: (212) 752-8393

*Attorneys for Plaintiff Glenn A. Culpepper*